IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| JIMMY A. REED,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>TOWN OF WILLISTON, THOMAS A. RIVERS,<br>MICHAEL BENJAMIN, PHIL FREDERICK,<br>MILTON WIDENER, SCOTTY RICHARDSON,<br>WANDA B. MATTHEWS, SCOTT NEELY,<br>SEAN MOODY, CHRISTOPHER RIVERS,<br>in their individual capacities,<br><br>　　　　　Defendants. | ) Civil Action No. 1:08-2451-MBS-JRM<br>)<br>)<br>)<br>)<br>)<br>)**REPORT AND RECOMMENDATION**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

　　　　　Plaintiff, Jimmy A. Reed ("Reed"), alleges racial discrimination in violation of Title VII in

connection with his termination as Recreation Director of the Town of Williston ("the Town"). He

alleges that the other Defendants conspired against him in violation of South Carolina law.

Previously, the Court dismissed the conspiracy claim as to Thomas A. Rivers ("T. Rivers"), Michael

Benjamin ("Benjamin"), Phil Frederick ("Frederick"), Milton Widener ("Widener"), Scotty

Richardson ("Richardson"),[1] Wanda B. Matthews ("Matthews"), and Scott Neely ("Neely") because

they are public officials and, therefore, are protected under South Carolina law. The motion to

dismiss Sean Moody ("Moody") and Christopher Rivers ("C. Rivers") was denied.

---

[1]The parties have stipulated that the dismissal of Richardson was inadvertent. He remains
a Defendant.

Defendants filed a "Motion for Judgment on the Pleadings and/or for Summary Judgment" on August 7, 2009. Reed filed a response on September 28, 2009. Defendants filed a reply on October 15, 2009.

## Facts

The facts, either undisputed, or according to the plaintiff as the non-moving party, with all reasonable inferences therefrom, to the extent supported by the record, are as follows:

1. Reed is African-American.

2. In 2003, Neely, Williston's Town Administrator, interviewed and hired Reed for the part-time position of Recreation Director.

3. According to Reed:

> I was responsible for the overall program, as far as maintaining the - - the fields. Also, making sure that the program ran smooth, as far as game schedules and equipment and maintaining the equipment associated with the recreation department. And also reporting back to management; Scott Neely, any problems that arose within the department. But overall heading the program up and running everything.

(Pl.Dep., 16).

4. Reed received his initial six month performance appraisal in November of 2003.

Neely rated him as a 3.72 of a possible 5 but noted:

> Jimmy should continue to work toward improving his knowledge about the administrative side of running a Recreation Department. He should continue to interact with other Recreation Directors to find new and better ways of doing things.

(Def.Mem., Ex. 5).

5.  Reed received his first full annual performance appraisal in August of 2004. Neely

    rated him slightly lower at 3.36 of a possible 5. Reed was rated at a below average

    level of performance in the "communication" category. Neely noted:

    > I perceive that communication with volunteers, parents and
    > participants needs to be improved. I have had several complaints from
    > parents and others that communication between coaches and parents
    > needs improvement. I have also had many complaints that parents are
    > not adequately informed about schedules for games, special events,
    > etc. I encourage Jimmy to continue to work on these problems
    > Communication is absolutely vital in any Recreation Department.

    (*Id.*)

6.  Neely noted improvement in the "communication" category in Reed's 2005

    performance appraisal. He was rated a 3.82 of a possible 5.

7.  Neely began to receive complaints concerning Reed from the public. When Neely

    confronted Reed with the complaints, Reed took the position that since there were no

    complaints in writing, they did not exist. (Pl.Dep., 69-70).

8.  In June of 2006, Neely received an anonymous letter from a parent.[2] (Def.Mem., Ex.

    9). The letter asked that Reed be replaced as Director because the Recreation

    Department was "going downhill." The writer complained that the girls' softball

    teams (age 10-12) had been reduced from four to two teams and that the teams were

    largely segregated. The writer described Reed as "arrogant" and that parents faced

    a "brick wall" in dealing with Reed. In a postscript the writer added that "(i)t does

---

[2]Neely later identified the parent as Annie Smalls Tyler, an African-American. (Neely Dep., p. 53).

not matter if the [replacement] is black or white," but "someone who wants the best for our kids."

9.    Neely did not use the standard form to evaluate Reed for the 2006 evaluation period (July 1, 2005 through June 30, 2006). Instead, the evaluation signed by Reed on July 6, 2006, read:

> Usually I evaluate Jimmy Reed's job performance using the standard performance evaluation form. I have chosen to do a very basic evaluation report for Jimmy this year. The problems in the Recreation Department are well known to anyone involved in the program, and Jimmy is certainly aware of them. Most of the problems center around the baseball program, but soccer and football are also involved to a lesser degree. I have received several complaints from parents and coaches. Several baseball coaches are very upset, and some are saying that they will not return next year unless changes are made. At least one sponsor is threatening to leave the program. Some parents are saying that they will pull their children form the program if things are not resolved. Those parents and coaches that have complained put the blame for the problems squarely on Jimmy's shoulders. Some want Jimmy to be removed from his position as Recreation Director.
>
> The complaints are summarized as follows:
>
> Jimmy is too arrogant and/or authoritarian - his way or no way. Coaches have little input. This complaint has been made by several parents and coaches.
>
> Jimmy is <u>extremely</u> disorganized - folks do not know where to be and when to be there, because they have not been told. Changes are made to the schedule, but some are not informed. This complaint has been made by coaches and parents.
>
> Jimmy is <u>extremely</u> disorganized - he does not organize football far enough in advance so Williston can participate in the jamboree.
>
> Jimmy does not follow the rules - some have stated that Jimmy does not follow the Dixie Youth rules for baseball.

Jimmy frequently makes untrue statements - this is perhaps the complaint I have heard the most. Many people have told me that Jimmy has said one thing then did another, or alternative, he told them something at one point in time and then denied saying it later on.

Jimmy tolerates racism and cronyism in the program - the complaint about racism is certainly a very serious complaint that we must be careful to investigate. I believe that most of these complaints stem from the fact that some of the baseball/softball teams seemed to be segregated by race to a large degree. There have also been some charges that the umpires play favorites based on race.

*       *       *

I cannot prove or disprove the validity of these complaints at this point, but I do know that the large number of complaints, and the intensity of the complaints, is telling. There is no doubt in my mind that there are major problems that must be addressed if Jimmy is to be effective as Recreation Director.

I have also counseled Jimmy about his failure to obtain purchase orders before ordering supplies, uniforms, etc. I have indicated to Jimmy that a signed purchase orders must be obtained prior to making purchases. Jimmy has indicated that he understands this policy and will abide by it.

Jimmy must address the apparent problems in the recreation department with the utmost urgency. We cannot allow our recreation program to disintegrate. Volunteer coaches are critical to our program, and we cannot afford to have coaches leave due to hard feelings. I have requested that Jimmy hold a meeting with his coaches after All Stars in order to discuss the apparent problems and find solutions. I have informed Jimmy that I want to attend this meeting.

I must rate Jimmy's overall performance at this time as "UNSATISFACTORY." This is not to say that everything Jimmy has done in the past year is unacceptable. For example, I applaud Jimmy's efforts to create more opportunities for girls to play sports. I expect Jimmy to work very hard to repair his relationship with those coaches and parents who are apparently so disappointed with Jimmy and our recreation program in general. If Jimmy is unable to remedy these problems in a timely manner, the Town may be forced to look for someone else to lead the town's recreation programs.

(Def.Mem., Ex. 7).

10.     The meeting with the baseball coaches mentioned above was held July 13, 2006.

        (*Id.*)

11.     According to Neely, Reed was given until May of 2007 to "right the ship." (Neely

        Dep., 130).

12.     However, in January of 2007 Neely recommended to the Town Council that Reed be

        terminated.  Council voted to give Reed further opportunity and Jerry Holmes, the

        lone African-American on Council, agreed to act as "liaison" between Nelly and

        Reed. "The goal was to help Jimmy turn this around." (Def.Mem., Ex. 14, ¶ 7).

13.     On May 14, 2007, Richardson, Rivers and Moody appeared before Town Council.

        The minutes of the meeting reflect:

> Mr. Scotty Richardson addressed Council concerning problems in the
> Recreation Department.  Mr. Richardson contended that the number
> of children playing sports is down considerably (1 team in softball, 14
> children in Coach's Pitch, 4 teams for T-ball.  Mr. Richardson
> suggested that there have been scheduling conflicts, no rules given to
> coaches/players, no one to address the problems.  De did not think the
> Town was doing enough to get information to the children, not
> offering scholarships, etc.  Mr. Chris Rivers also addressed this issue
> and stated a total lack of organization was behind the major problems
> and that no one had control of the department.  Mr. Sean Moody
> stated that he shared the concerns raised by Messrs. Richardson and
> Rivers.  Councilman Widener made a motion to accept these
> statements as information with a second by Councilwoman Matthews.
> All voted in favor.

        (Def.Mem., Ex. 13).

14.     Reed was terminated on June 6, 2007. (Def.Mem., Ex. 5).

15. Reed filed a charge of discrimination with the South Carolina Human Affairs Commission dated August 29, 2007.  He stated:

    I.        I was terminated on May 14, 2007.

    II.      The respondent stated I was terminated because of an overwhelming amount of complaints from parents and coaches.

    III.    I contend the reason given for my termination is pretextual and that there were no overwhelming numbers of complaints filed against me. I was not notified of the town meeting which led to my termination and no investigation was carried out with respect to the complaints. I had excellent performance reviews.  I believe I was terminated because I got more black coaches/referees and umpires involved in the program.  I was the first black department head in the town.  To my knowledge, all of the complaints were filed by white citizens.

    IV.    I therefore believe that I have been discriminated against because of my race (black) in violation of the South Carolina Human Affairs Law, as amended and Title VII of the United States Civil Rights Act of 1964, as amended.

(Def.Mem., Ex. 5).

16. A white male, James Hewitt ("Hewitt") was hired to replace Reed as Recreation Director.

## Discussion

### 1.  Motion to Dismiss

Defendants have moved to dismiss Reed's Title VII race discrimination claim pursuant to Rule 12(c), Fed.R.Civ.P.   The rule provides:

> After the pleadings are closed - but early enough not to delay trial - a party may move for judgment on the pleadings.

Even though the motion to dismiss is coupled with an alternative motion for summary judgment pursuant to Rule 56, Defendants rely only on the allegations in the complaint to support

their argument. In this case the pleadings are closed and the motion will not delay trial because both the motion to dismiss and the motion for summary judgment will be addressed in this Report and Recommendation. Plaintiff makes an equitable argument against the motion . He basically asserts that the motion could have been made earlier, i.e, at the same time that the Defendants filed their previous Rule 12(c) motion to dismiss the conspiracy claim. Plaintiff argues that if Defendants filed their motion earlier, "the likely result would be the Court would have allowed Reed an opportunity to amend his complaint." (Pl.Mem., 9-10). For this reason, Plaintiff asserts the motion is untimely. Reed offers no precedent for this argument, and the undersigned finds that the Rule 12(c) motion was timely filed.

Title VII provides in part:

It shall be an unlawful employment practice for an employer –

to ...discharge any individual...because of such individual's race...

42 U.S.C. § 2000e-2(a)(1).

In a disparate treatment case such as this one, a plaintiff must prove that "but for" his race, he would not have been terminated. Holmes v. Bevilacqua, 794 F.2d 142 (4th Cir. 1986).

The same standard used to decide Rule 12(b)(6) motions applies to Rule 12(c) motions. Independence News, Inc. v. City of Charlotte, 568 F.3d 148, 154 (4th Cir. 2009). A complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2)

In Bell Atlantic Corp. V. Twombly, 550 U.S. 544 (2007) the Supreme Court addressed the pleading requirements of Rule 8(a)(2) and abrogated the "no set of facts" standard from Conley v.

Gibson, 355 U.S. 41 (1957). The Court stated "an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. Last year, the Court further explained the "(t)wo working principles" upon which the Twombly decision rests: (1) "a court must accept as true all of the allegations contained in a complaint" but not legal conclusions; and (2) "only a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1949-1950 (2009). After distinguishing the well-pleaded facts from the legal conclusions, the Court must then determine whether the complaint's factual allegations support a "plausible claim for relief." *Id. See also* Giarrantano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008).

In the present case, Defendants assert that Reed's Title VII claim should be dismissed because he has not stated a plausible claim for relief. Further, Defendants argue that the facts pled by Reed do not support a plausible claim for relief.

Review of the complaint shows that Reed does not allege that he was terminated because of his race. Instead he alleges that after he was hired, he revitalized the town's youth sports programs (Complaint, ¶ 8) and instituted "a race neutral basis and all his sports were equal opportunity." (*Id.,* ¶ 10). Reed further alleges:

> In 2006 and 2007, the plaintiff came under great criticism from certain members of the white community for his involvement of more black coaches and more black children into the athletic programs. Particularly criticism was leveled at him because some members of the white community with young daughters did not want their daughters to play on segregated softball teams and preferred that there be all white teams and that black children be excluded.

> (*Id.,* ¶ 9).

In support of his race discrimination charge, Reed alleges:

9

Because of the plaintiff's insistence upon equal opportunity participation by black and white children in the program, his program was boycotted by many white parents and children and ultimately he was pretextually terminated from his position on false and unimportant charges.

(*Id.,* ¶ 15).

In other words, Reed alleges that his efforts to bring a race neutral youth sports program to Williston resulted in a "backlash by white citizens who made false charges against him" (*Id.,* ¶ 12), and that he was "pretextually terminated" based on these "false and unimportant charges."

The undersigned concludes that Reed does not state a plausible claim for relief because he does not allege that he was terminated based on his race. Further no facts alleged in the complaint would support a claim that Reed was terminated because of his race. *See* Long v. Wray Automotive, Inc., 2007 WL 2579438, *3 (D.S.C.) ("Plaintiff's hostile work environment claim cannot prevail on this second-hand harassment theory, because plaintiff presents no evidence of harassment actually directed at plaintiff on the basis of her gender that would be actionable under Title VII").

## 2. Title VII Race Discrimination

Defendants assert that even if Reed had properly pled a Title VII race claim, he could not prevail because he cannot establish a prima facie case of discrimination, and even if he could the Defendants have articulated a legitimate, non-discriminatory reason for his dismissal which he has not shown to be pretextual.

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Id.* Courts take special care when considering summary judgment in employment discrimination cases because states of

mind and motives are often crucial issues. <u>Ballinger v. North Carolina Agric. Extension Serv.</u>, 815 F.2d 1001, 1005 (4th Cir.), *cert. denied*, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "'the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> <u>fact</u>.'" *Id.* (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 364 (4th Cir. 1985).

In this case, Defendants "bear the initial burden of pointing to the absence of a genuine issue of material fact." <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). If Defendants carry this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." *Id.* at 718-19 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." <u>Baber v. Hosp. Corp. of Am.</u>, 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Id.* and <u>Doyle v. Sentry Inc.</u>, 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [*see* Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. <u>Baber</u>, citing <u>Celotex Corp.</u>, *supra*. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that

would apply at a trial on the merits." <u>Mitchell v. Data General Corporation</u>, 12 F.3d 1310, 1316 (4th Cir. 1993) and <u>DeLeon v. St. Joseph Hospital, Inc.</u>, 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. <u>Martin v. John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547 (5th Cir. 1987) and <u>Evans v. Technologies Applications & Services Co.</u>, 875 F. Supp. 1115 (D.Md. 1995).

### a. Disparate Treatment

As noted above, Title VII prohibits an employer from terminating an employee because of his race, and the employee must show that "but for" his race he would not have been terminated.

Reed alleges a violation of 42 U.S.C. § 2000e-2(a). That statute provides:

> It shall be an unlawful employment practice for an employer--
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . . .

This is a disparate treatment case and Plaintiff must prove that "but for" his race, he would not have been terminated. <u>Holmes v. Bevilacqua</u>, 794 F.2d 142 (4th Cir. 1986). Plaintiff can prove Defendants' motive to discriminate by two methods. First, the "plaintiff may meet this burden under the ordinary standards of proof by direct and indirect evidence relevant to and sufficiently probative of the issue. In the alternative, a plaintiff may resort to the judicially created scheme established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981)." <u>EEOC v. Clay Printing Company</u>, 955 F.2d 936 (4th Cir. 1992).

12

To overcome a motion for summary judgment, under the ordinary standards of proof, Reed is required to produce direct evidence of a stated purpose to discriminate on the basis of race and/or circumstantial evidence of a stated purpose to discriminate on the basis of race of sufficient probative force to reflect a genuine issue of material fact. Goldberg v. B. Green and Co., Inc., 836 F.2d 845 (4th Cir. 1988). Reed has produced no direct evidence.

The parties agree on the framework Reed must utilize to establish a prima facie case that he was terminated due to his race. Reed cites Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999) for the following framework that he must use to establish a prima facie case of race discrimination:

> (1) he is a member of a protected class; (2) he was terminated; (3) at the time of his termination he was performing at a level that met his employer's legitimate job expectations; and (4) "that the position remained open to or was filled by similarly qualified applicants outside the protected class."

> (Pl.Mem., p. 14).

Defendants concede that Reed has established the first two elements. However, they argue that Reed has not established the second two elements.

### (1) Legitimate Expectations

Defendants argue that Reed was terminated based on his poor performance as outlined by Neely in the 2006 performance evaluation. Reed has offered nothing other than his own opinion ("I think I did a great job as recreation director"). (Pl. Dep., 48)). During his deposition, Reed appeared to acknowledge that Neely received complaints about his performance as Recreation Director. He thought he was treated unfairly because he was "accused" instead of "defended" by Neely. (Pl.Dep., 63-64). However, when asked if he had any evidence that Neely was not receiving

complaints, Reed said he had none, but "as town policy goes, there's no complaint unless its in writing or signed."[3] (Pl.Dep., 69). Reed repeated this position when questioned about the specifics of the 2006 performance appraisal. (Pl.Dep., 69-85). When asked about his rating of unsatisfactory in the 2006 appraisal, Reed responded:

> And I felt like that was unfair. What basis does he have [for] that? Because he only had just verbal accusations, people put nothing in writing against me. (Pl.Dep., 85).

Neither a plaintiff's own testimony nor the testimony of co-workers can establish a genuine issue of material fact as to whether he was meeting his employer's expectations. King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003). Further, a plaintiff must present evidence to show that his employer actually believed that his performance was acceptable for its is the employer's perception that controls. Hawkins v. Pepsico, Inc., 203 F.3d 274, 279 (4th Cir. 2000).

In any event, Defendants have presented ample evidence that Reed's performance was unsatisfactory. The June 4, 2006 anonymous letter is quite explicit. (Def.Mem., Ex. 9). Richardson, Moody and Rivers expressed dissatisfaction at the Town Council meeting. (Def.Mem., Ex. 13). The notes from the meeting following the baseball season showed frustration. (Def.Mem., Ex. 7). Further, Homes states that he received numerous complaints from "officials, coaches and parents, and from all races." (Holmes Aff., ¶ 3). It is undisputed that Holmes was selected to work with Reed to "help Jimmy turn things around." (Id., ¶ 7). When improvement did not occur, Reed was terminated.

---

[3]Reed has produced no evidence of such a policy.

### (2)  Hewitt

Defendants also assert that Reed cannot establish the fourth element of the prima facie case even though they concede that Reed was replaced by an individual outside the protected group, Hewitt, a white male. Defendants argue, based on <u>Brinkley v. Harbour Recreation Club</u>, the case cited by Reed, that Reed cannot show that he was more qualified for the position than Hewitt.

In <u>Brinkley</u>, an "unproven business manager" was promoted to general manager of a country club and later terminated for poor performance.  The country club then hired an individual from outside the protected group as replacement.  The court found that plaintiff could not prove the fourth element of the prima facie case based on the superior qualifications of the replacement (extensive country club management experience including two prior positions as general manager of country clubs).  (<u>Brinkley</u>, 180 F.3d at 610-611).

In the present case the experience of Reed and Hewitt were different.  Reed was from the area and grew up playing sports.  He had coached football in the Recreation Department's program for fifteen years and served as a high school assistant coach in football and basketball for nine years.  On the other hand, Hewitt had served as a high school teacher, coach, and athletic director for 32 years. (Def.Mem., Ex. 9).  While it appears that Hewitt's qualifications were somewhat superior to those of Reed, the undersigned concludes that they were not so vastly superior to prevent Reed from establishing the fourth element of the prima facie case.  Notably, neither had experience as a municipal recreation director.

### (3) Pretext

Defendants argue that even if Reed could establish a prima facie case of discrimination, they have proffered a legitimate, non-discriminatory reason for Reed's termination (poor performance) which Reed cannot show is pretextual. Under the standard McDonnel- Douglas analysis, if the Plaintiff establishes a prima facie case, a rebuttable presumption is created that the discharge was due to unlawful discrimination. The Defendants at that point must then come forward with a legitimate non-discriminatory explanation for the action. When the Defendants do so, the presumption of discrimination evaporates, and the Plaintiff must prove the Defendants' proffered reason is pretextual and that the discharge was the result of unlawful discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 504 (1993).

As discussed above, the record shows that Reed's performance as Recreation Director was unsatisfactory in 2006. He has not shown that this proffered reason was pretextual.

Additionally, Reed attempts to show pretext by demonstrating that three white employee performed unsatisfactorily, but were not terminated. He identifies Roger Kaney ("Kaney"), the Police Chief, Calvin Melton ("Melton"), Sanitation and Maintenance Director, and Jimmy Black, a policeman. (Pl.Mem., 17-19). However, Reed has produced little evidence other than his own deposition testimony to show that these individuals were similarly situated or that their performance compared to his. For instance, Reed has not produced any performance appraisals of these individuals.

According to Reed, Kaney was called before town council to discuss possible violation of policy with respect to car chases, there were reports of racism in the police department in 2001 which led to demonstrations, and Kaney did not discipline Black for an alleged domestic dispute which was

reported in the press. (Pl.Dep., 88-91). However, Reed gives no details of these allegations, the time frame over which they occurred, or the result of any investigation or inquiry. According to Neely, Kaney's personnel file was void of employee or citizen complaints and he (Neely) had received no complaints about him. (Neely Dep., 89 and 125).

Reed also testified that Melton was investigated by the South Carolina Law Enforcement Division ("SLED") for sexually harassing females who were directed to the Sanitation and Maintenance Department to perform community service. (Pl.Dep., 91-92). According to Neely, he was contacted by SLED about the investigation, it went on for some time and he heard no more about it. The Town received no official notice and Neely assumed the investigation had been dropped. Neely had no knowledge of the specifics of the allegations or the result of the SLED investigation. (Neely Dep., 90).

Reed has provided insufficient evidence to create an issue of fact as to these comparators. He, therefore, cannot show pretext.

### b. Conspiracy

Reed alleges a claim for a civil conspiracy under South Carolina law against the individual Defendants. Early in the case the individual Defendants moved for dismissal pursuant to Rule 12(c). The undersigned filed a Report and Recommendation to which objections were filed. Ultimately, the Court issued an order, thoroughly discussing South Carolina law, which dismissed the conspiracy claim against the individual who worked for the town and denied the motion to dismiss against the individual Defendants who were not employed by the town. The Court concluded that at that stage of the case the record was insufficient to determine whether Reed was a public official.

The remaining individual Defendants (Richardson, Moody and Rivers) have now moved for summary judgment arguing that Reed was a public official, and therefore, he cannot maintain a civil conspiracy claim against them, and even if he could, there is insufficient evidence to go forward on the claim.

Under South Carolina law a public official who is employed at-will is prohibited form suing anyone for a civil conspiracy. *See* Angus v. Burroughs Chapin Co., 628 S.E.2d 261, 262 (S.C. 2006) referred to as "Angus II" in the pleadings. In Angus II, the Supreme Court held that an at will public official (a former county administrator) could not maintain a civil conspiracy claim based on her status as a public official.

It is undisputed and the Court previously found that Reed was at-will. The issue presently presented is whether Reed was a public official or simply an employee of the town. If he was a public official his civil conspiracy claim must be dismissed. Reed makes no argument to the contrary. If he was only an employee, summary judgment analysis is necessary.

The South Carolina Supreme Court drew a distinction between an "officer" and an "employee" in Sanders v. Belue, 78 S.C. 171, 174 S.E. 762, 763 (1907)

> One who is charged by law with duties involving an exercise of some part of the sovereign power, either small or great, in the performance of which the public is concerned, and which are continuing, and not occasional or intermittent, is a public officer. Conversely, one who merely performs the duties required of him by persons employing him under an express contract or otherwise, though such persons be themselves public officers, and though the employment be in or about a public work or business, is a mere employee.

In a case addressing whether policemen were "officers" under the South Carolina criminal bribery statute, the Supreme Court enumerated factors to be considered in assessing the difference.

> Criteria to be considered in making the distinction between an officer and an employee include whether the position was created by the legislature; whether the qualifications for appointment are established; whether the duties, tenure, salary, bond and oath are prescribed or required; whether the one occupying the position is a representative of the sovereign; among others. No single criteria is conclusive; neither is it necessary that all the characteristics of an officer or officers be present.

State v. Crenshaw, 274 S.C. 475, 478, 266 S.E.2d 61, 62-63 (1980) (citations omitted).

The court found that the policemen were officers.

There is nothing in the record to support a finding that Reed's position was created by the legislature, that there were qualifications established for his appointment, or that his duties, tenure, salary, bond and oath were prescribed. Defendants argue in essence that Reed was a representative of the sovereign, i.e., the Town. However, Reed's authority to act as a representative was extremely limited. Based on these criteria and the record before this Court, the undersigned concludes that Reed's position as part time Recreation Director did not make him a public official of the Town of Williston.

South Carolina precedent defines the three elements of the tort of civil conspiracy: (1) a combination of two or more persons, (2) for the purpose of injuring the Plaintiff, and (3) causing the Plaintiff special damages. Hackworth v. Greywood at Hammett, LCC, 385 S.C. 110, 682 S.E.2d 871, 873 (Ct.App. 2009) citing Vaught v. Waites, 300 S.C. 201, 387 S.E.2d 91 (Ct.App. 1989). The gravamen of a civil conspiracy "is the damage resulting to plaintiff from an overt act pursuant to a common design."

Reed's conspiracy claim centers on the fact that Richardson, Moody and Rivers appeared at the Town Council meeting on May 14, 2007, and voiced concerns about disorganization of the Recreation Department. Reed appears to assert that their appearance was an orchestrated overt act

of a conspiracy to have him terminated. Reed offers some speculative testimony that Richardson, Moody and Rivers met in advance to plan their appearance. (Pl.Dep., 104-106). He also speculates that Rivers had a "personal vendetta" against him because a volunteer coach at some point would not let his son play receiver on a football team. (Pl.Dep. 121-122).

Given the context of this case, Reed's allegations seem implausible. The minutes from the Town Council meeting do not reflect that Richardson, Moody and Rivers called for Reed's termination. Instead, they added to the chorus of complaints about problems in the Recreation Department. Ms. Tyler wrote the anonymous letter to Neely asking that Reed be replaced almost a year before the meeting. Reed does not assert that Ms. Tyler was a part of the alleged conspiracy. Further, Reed's 2006 unsatisfactory performance rating had been concluded. Well before the meeting, Neely had recommended that Reed be terminated and Holmes was working with Reed to help Reed turn things around. (Def.Mem., Ex. 14).

Even assuming that Reed has established the first two elements of his conspiracy claim, it fails because he has not pled or proved special damages. "Because of the quiddity of a civil conspiracy claim is damage resulting to the plaintiff, the damages alleged must go beyond the damages alleged in other causes of action." Pye v. Estate of Fox, 369 S.C. 555, 568, 633 S.E.2d 505, 511 (2006). In the present case the object of the conspiracy appears to be the basis of Reed's Title VII claim - termination. The damages alleged for both are identical. Richardson, Moody, and Rivers are entitled to summary judgment.

### Conclusion

In accord with the above discussion, it is recommended that Defendants' motion for summary

judgment be **granted**.



Joseph R. McCrorey
United States Magistrate Judge

February 26 , 2010
Columbia, South Carolina

21