IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Jimmy A. Reed, | ) | |
| | ) | C.A. No. 1:08-cv-02451-MBS |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| Town of Williston, Thomas A. Rivers, | ) | |
| Michael Benjamin, Phil Frederick, Milton | ) | |
| Widener, Scotty Richardson, Wanda B. | ) | |
| Matthews, Scott Neely, Sean Moody, | ) | |
| Christopher Rivers, in their individual | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff Jimmy A. Reed was hired as Recreation Director of the Town of Williston ("the

Town") in 2003. He was terminated in May 2007. Plaintiff filed the within action on July 8, 2008

against the Town, Town Mayor Thomas A. Rivers ("T. Rivers"); Town Council members Michael

Benjamin ("Benjamin"), Phil Frederick ("Frederick"), Milton Widener ("Widener"), Scotty

Richardson ("Richardson"), and Wanda B. Matthews ("Matthews"); Town Administrator Scott

Neely ("Neely"); and Town citizens Sean Moody ("Moody"), and Christopher Rivers ("C. Rivers")

(collectively Defendants), alleging racial discrimination in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e, *et seq.* Plaintiff also alleges a state law cause of action for civil

conspiracy against the individual Defendants. The court previously granted a motion to dismiss the

civil conspiracy claim as to T. Rivers, Benjamin, Frederick, Widener, Richardson,[1] Matthews, and

Neely because they are employers protected under South Carolina law. *See Angus v. Burroughs &*

---

[1] The parties have stipulated that Richardson's dismissal was inadvertent. Richardson remains a
Defendant in this case. (Entry 31).

*Chapin Co.*, 628 S.E.2d 261, 262 (S.C. 2006) ("[A]n at-will employee may not maintain a civil conspiracy action against h[is] employer."). However, the motion to dismiss was denied as to Moody and C. Rivers because there was insufficient evidence to determine whether Plaintiff is a public official. *See id.* (a public official who is an at-will employee cannot maintain an action for civil conspiracy).

This case is before the court on Defendants' Motion for Judgment on the Pleadings and/or Summary Judgment, which was filed on August 7, 2009. On September 28, 2009, Plaintiff responded. On October 15, 2009, Defendants replied.

In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, this matter was referred to United States Magistrate Judge Joseph R. McCrorey for pretrial handling. On February 26, 2010, the Magistrate Judge issued a Report and Recommendation recommending that Defendants' Motion for Judgment on the Pleadings and/or Summary Judgment be granted. On March 11, 2010, Defendants filed objections to the Report and Recommendation. On March 19, 2010, Plaintiff filed his objections to the Report and Recommendation.

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1). The court is charged with making a *de novo* determination of any portions of the Report and Recommendation to which a specific objection is made. *Id.* In the absence of a timely filed objection, a district court need not conduct a *de novo* review, but instead must "only satisfy itself that there is no clear error on the face of the record in

2

order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

## **FACTS**

The facts in a light most favorable to Plaintiff, the non-moving party, are as follows.  In 2003, Plaintiff, an African American, was hired by Neely for the position of Recreation Director.  This position was intended to be part-time, but Plaintiff worked approximately forty hours per week. Prior to obtaining the position as Recreation Director, Plaintiff served as a coach in the Town's Recreation Department for about fifteen years and as an assistant coach for the Williston-Elko High School football and basketball teams for about nine years.  Plaintiff was the first black department head the Town had ever had.

In describing his responsibilities as Recreation Director, Plaintiff states:

> I was responsible for the overall program, as far as maintaining the - - the fields. Also, making sure the program ran smooth, as far as game schedules and equipment and maintaining the equipment associated with the recreation department.  And also reporting back to management; Scott Neely, any problems that arose within the department.  But overall heading the program up and running everything.

(Plaintiff's Dep., 16:16-23).  In performing his duties, Plaintiff could enter into contracts related to the recreation program on the Town's behalf.  Plaintiff did not have the power to hire employees for the Town, but he could engage independent contractors to do limited work for the Recreation Department.  Plaintiff had spending authority up to $250 per purchase, but was required to get approval for higher expenditures and large projects.  Plaintiff maintained the Town's recreational facilities and controlled their use for that purpose.  However, the Town Council could approve the use of the facilities for other purposes.  Plaintiff had the authority to enforce facility rules and to add new rules on a limited basis.  Plaintiff consulted with parents and coaches before making rule

changes. While Plaintiff could not permanently ban a parent or coach from Recreation Department activities without Council approval, he could expel individuals from games for inappropriate behavior.

In November 2003, Plaintiff received a six month appraisal of his work from Neely. Plaintiff was given a total score of 3.72 out of 5. With regard to the area of Effective Communication, Plaintiff was given a score of 3 with the following comment: "Jimmy maintains regular communications with the Council and me. I have had some complaints from parents and others that communication between coaches and parents needs improvement. I believe Jimmy has already worked to improve communications with parents. Jimmy should continue to work on this element in the future." With regard to improvement in the coming year, Neely noted: "Jimmy should continue to work toward improving his knowledge about the administrative side of running a Recreation Department. He should continue to interact with other Recreation Directors to find new and better ways of doing things." (Entry 37, Plaintiff's Dep., Ex. 2)

On August 23, 2004, Plaintiff received his first full-year performance appraisal. Plaintiff received a total score of 3.36 out of 5. With regard to Effective Communication, Plaintiff received a score of two, which is below average performance. The notations state:

> Jimmy maintains regular communications with me. However, I perceive that communication with volunteers, parents and participants needs to be improved. I have had several complaints from parents and others that communication between coaches and parents needs improvement. I have also had many complaints that parents are not adequately informed about schedules for games, special events, etc. I encourage Jimmy to continue to work on these problems. Communication is absolutely vital in any Recreation Department.

(Entry 37, Plaintiff's Dep., Ex. 3). With regard to areas for improvement, Neely noted:

> Jimmy should continue to work toward improving his knowledge about the

administrative side of running a Recreation Department. He should continue to interact with other Recreation Directors to find new and better ways of doing things.

Additionally, Jimmy should work diligently to improve communication within the Recreation Department. Coaches, parents and participants should be informed of schedules as far in advance as possible.

(Entry 37, Plaintiff's Dep., Ex. 3). In concluding, Neely wrote: "I have been very pleased with Jimmy's overall performance during his first year as Recreation Director. I wish him continued success with the position."

In his 2005 performance appraisal, Plaintiff received a score of 3.82 out of 5. Plaintiff's Effective Communication score rose to a 4 out of 5 with Neely noting: "Jimmy has improved communications with volunteers, parents and participants. This has improved since last year."

(Entry 37, Plaintiff's Dep., Ex. 4). In the concluding comments section, Neely wrote:

Jimmy has improved on many factors . . . Jimmy should continue to work toward improving his knowledge about the administrative side of running a Recreation Department. He should continue to interact with other Recreation Directors to find new and better ways of doing things. Also, Jimmy should continue to focus on safety and communications within the Recreation Department.

(Entry 37, Plaintiff's Dep., Ex. 4).

During the next year, Neely received numerous complaints about Plaintiff from the public, most of which were verbal complaints. When Neely presented the complaints to Plaintiff, Plaintiff took the position that since these complaints were not in writing, they could not count against him. Neely received a written complaint from a Mr. Gardner indicating that he thought that there were problems in the recreation department. In June 2006, Neely received an anonymous letter from a concerned parent, later identified as Annie Smalls Tyler, an African-American. The letter requested that Plaintiff be removed from his position as Recreation Director because the department was

"going downhill." (Entry 37, Ex. 9). The letter complained that the girls' softball teams had been reduced from four to two teams and that the teams were largely segregated along racial lines. The writer described Plaintiff as arrogant and stated that communicating with Plaintiff was like running "into a brick wall." *Id.* The writer indicated in a post-script that it did not matter whether the new director was "white or black so long as the person did what was best for the kids." *Id.*

In July 2006, Plaintiff received his next annual performance review. For this review, Neely declined to use the standard form to evaluate Plaintiff. Instead, the evaluation was written in a narrative form. The evaluation read:

> Usually I evaluate Jimmy Reed's job performance using the standard performance evaluation form. I have chosen to do a very basic evaluation report for Jimmy this year. The problems in the Recreation Department are well known to anyone involved in the program, and Jimmy is certainly aware of them. Most of the problems center around the baseball program, but soccer and football are also involved to a lesser degree. I have received several complaints from parents and coaches. Several baseball coaches are very upset, and some are saying that they will not return next year unless changes are made. At least one sponsor is threatening to leave the program. Some parents are saying that they will pull their children form [sic] the program if things are not resolved. Those parents and coaches that have complained put the blame for the problems squarely on Jimmy's shoulders. Some want Jimmy to be removed from his position as Recreation Director.

The complaints are summarized as follows:

> Jimmy is too arrogant and/or authoritarian - his way or no way. Coaches have little input. This complaint has been made by several parents and coaches.

> Jimmy is extremely disorganized - folks do not know where to be and when to be there, because they have not been told. Changes are made to the schedule, but some are not informed. This complaint has been made by coaches and parents.

> Jimmy is extremely disorganized - he does not organize football far enough in advance so Williston can participate in the jamboree.

> Jimmy does not follow the rules - some have stated that Jimmy does not follow the Dixie Youth rules for baseball.

Jimmy frequently makes untrue statements - this is perhaps the complaint I have heard the most. Many people have told me that Jimmy has said one thing then did another, or alternatively, he told them something at one point in time and then denied saying it later on.

Jimmy tolerates racism and cronyism in the program - the complaint about racism is certainly a very serious complaint that we must be careful to investigate. I believe that most of these complaints stem from the fact that some of the baseball/softball teams seemed to be segregated by race to a large degree. There have also been some charges that the umpires play favorites based on race.

*                    *                    *

I cannot prove or disprove the validity of these complaints at this point, but I do know that the large number of complaints, and the intensity of the complaints, is telling. There is no doubt in my mind that there are major problems that must be addressed if Jimmy is to be effective as Recreation Director. I have also counseled Jimmy about his failure to obtain purchase orders before ordering supplies, uniforms, etc. I have indicated to Jimmy that a signed purchase orders must be obtained prior to making purchases. Jimmy has indicated that he understands this policy and will abide by it.

Jimmy must address the apparent problems in the recreation department with the utmost urgency. We cannot allow our recreation program to disintegrate. Volunteer coaches are critical to our program, and we cannot afford to have coaches leave due to hard feelings. I have requested that Jimmy hold a meeting with his coaches after All Stars in order to discuss the apparent problems and find solutions. I have informed Jimmy that I want to attend this meeting.

I must rate Jimmy's overall performance at this time as "UNSATISFACTORY." This is not to say that everything Jimmy has done in the past year is unacceptable. For example, I applaud Jimmy's efforts to create more opportunities for girls to play sports. I expect Jimmy to work very hard to repair his relationship with those coaches and parents who are apparently so disappointed with Jimmy and our recreation program in general. If Jimmy is unable to remedy these problems in a timely manner, the Town may be forced to look for someone else to lead the town's recreation programs.

(Entry 37, Ex. 7).

The meeting with the coaches Neely requested was held on July 13, 2006. According to

Neely, from the time of the coaches meeting, Plaintiff was given until May 2007 to "right the ship." (Neely Dep. 130:7-8). In January 2007, however, Neely recommended to the Town Council that Plaintiff be terminated. The Town Council voted to give Plaintiff another chance and Jerry Holmes ("Holmes"), an African American on the Town Council, agreed to act as "liaison" between Neely and Plaintiff with the goal of helping Plaintiff to turn things around.

In early 2007, Richardson requested that he be put on the Town Council's agenda to discuss problems with the Recreation Department. Richardson was put on the Town Council's agenda for the meeting on May 14, 2007. According to Moody, Richardson told Moody on May 14, 2007 that there would be a meeting later that day at Town Hall to address issues with the Recreation Department. C. Rivers states that he found out about the Town Council meeting the same day it was held from some other parents at his son's little league game and that he left the game early to attend.

The minutes of the meeting state:

> Mr. Scotty Richardson addressed Council concerning problems in the Recreation Department. Mr. Richardson contended that the number of children playing sports is down considerably (1 team in softball, 14 children in Coach's Pitch, 4 teams for T-ball.[)] Mr. Richardson suggested that there have been scheduling conflicts, no rules given to coaches/players, no one to address the problems. He did not think the Town was doing enough to get information to the children, not offering scholarships, etc. Mr. Chris Rivers also addressed this issue and stated a total lack of organization was behind the major problems and that no one had control of the department. Mr. Sean Moody stated that he shared the concerns raised by Messrs. Richardson and Rivers. Councilman Widener made a motion to accept these statements as information with a second by Councilwoman Matthews. All voted in favor.

(Entry 37, Ex. 13). Some parents told Plaintiff that Richardson and other parents had gathered beforehand to plan their comment to the Town Council. Plaintiff received a phone call that day from a parent stating that a game had to be re-scheduled that night because the children had an event going on at school. Plaintiff checked into it, however, and found that there was no school event. Plaintiff

believes that this was a ruse created by certain parents so that they could attend the Town Council meeting.

Subsequent to the May 14, 2007 meeting, the Town Council discussed Plaintiff's job performance in executive session and T. Rivers recommended that Plaintiff be terminated. The Town Council decided to terminate Plaintiff by a vote of five in favor. Holmes was the only vote against termination. Plaintiff was terminated on June 6, 2007 by letter from T. Rivers. James Hewitt, a white male, was hired to replace Plaintiff as Recreation Director.

On August 29, 2007, Plaintiff filed a charge of discrimination with the South Carolina Human Affairs Commission. The charge states:

I.      I was terminated on May 14, 2007.

II.     The respondent stated I was terminated because of an overwhelming amount of complaints from parents and coaches.

III.    I contend the reason given for my termination is pretextual and that there were no overwhelming numbers [sic] of complaints filed against me. I was not notified of the town meeting which led to my termination and no investigation was carried out with respect to the complaints. I had excellent performance reviews. I believe I was terminated because I got more black coaches/referees and umpires involved in the program. I was the first black department head in the town. To my knowledge, all of the complaints were filed by white citizens.

IV.    I therefore believe that I have been discriminated against because of my race (black) in violation of the South Carolina Human Affairs Law, as amended and Title VII of the United States Civil Rights Act of 1964, as amended.

(Entry 35, Ex. 5).

## DISCUSSION

### I.     Motion for Judgment on the Pleadings

The Magistrate Judge found that Plaintiff, in his federal complaint, did not state a plausible claim for relief because: 1) Plaintiff did not allege that he was terminated based upon his race; and 2) no facts alleged in the complaint would support a claim that Plaintiff was terminated based on his race.  Plaintiff objects to this finding and argues that Defendant had fair notice that his claim was based on Plaintiff being racially discriminated against in his termination.  The court agrees.

Federal Rule of Civil Procedure 12(c) states: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  The same standard used to decide Rule 12(b)(6) motions is used to decide Rule 12(c) motions. *Independence News, Inc. v. City of Charlotte*, 568 F.3d 148, 154 (4th Cir. 2009).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully."  *Id.*  It requires the plaintiff to articulate facts that, when accepted as true, "show" that the plaintiff has stated a claim entitling him to relief, i.e., the "plausibility of 'entitlement to relief.' " *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 557). Therefore, a defendant's motion for judgment on the pleadings should be granted only if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim

entitling him to relief. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

Title VII, 42 U.S.C. 2000e-2(a)(1) states: "It shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race. . . ." Plaintiff alleges that:

> In 2006 and 2007, the plaintiff came under great criticism from certain members of the white community for his involvement of more black coaches and more black children into the athletic programs. Particularly criticism was leveled at him because some members of the white community with young daughters did not want their daughters to play on segregated [sic] softball teams and preferred that there be all white teams and that black children be excluded.

(Compl. ¶ 9). Plaintiff also alleges that "[b]ecause of the plaintiff's insistence upon equal opportunity participation by black and white children in the program, his program was boycotted by many white parents and children and ultimately [Plaintiff] was pretextually terminated from his position on false and unimportant charges." (Compl. ¶ 15). Plaintiff alleges that he was replaced by a white male, that the recreational programs "reverted to their former, segregated status," and that these actions by the Town constitute race discrimination. (Compl. ¶ 16, 17). Plaintiff further alleges that:

> [t]he termination and charges made were pretexual and also clearly exhibit disparate treatment and discrimination since white male participants in the athletic programs have consistently been treated more favorably under the same or similar circumstances and past incidents of misconduct, poor sportsmanship and outright hostility against the plaintiff, black coaches, umpires and officials in the athletic programs presented by the plaintiff have been totally ignored.

(Compl. ¶ 18).

Accepting all well-pleaded allegations in the complaint as true, and drawing all reasonable inferences therefrom, the court finds that Plaintiff has made sufficient allegations to state a plausible claim for race discrimination. Specifically, Plaintiff alleges that he worked to integrate the

Recreation Department and that because Plaintiff is black, the white community opposed his initiatives, leading to his termination.

## II.     Motion for Summary Judgment

### A.     Standard

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990). The non-moving party may not oppose a motion for summary judgment with mere allegations or denials of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial. Fed. R. Civ. Pro. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). All that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

B.     <u>Title VII Claim for Race Discrimination</u>

Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of demonstrating a *prima facie* case of racial discrimination. *Bryant v. Bell Atl. Md. Inc.*, 288 F.3d 124, 133 (4th Cir. 2002). If the plaintiff satisfies this initial burden, then a presumption of discrimination arises, and the burden shifts to the employer to produce a legitimate, non-discriminatory reason for its adverse employment action. *Beall v. Abbott Lab.*, 130 F.3d 614, 619 (4th Cir. 1997). If the employer satisfies its burden of production, then the presumption of discrimination disappears, and the burden of proof shifts back to the plaintiff to show that the employer acted with a discriminatory intent and that its proffered explanation is a pretext for discrimination. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007).

1.     Prima Facie Case

To establish a *prima facie* case of race discrimination, Plaintiff must show that: 1) he is a member of a protected class; 2) he was terminated; 3) at the time of his termination he was performing at a level that met his employer's legitimate job expectations; and 4) that the position remained open to or was filled by similarly qualified applicants outside the protected class. *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 609 (4th Cir. 1999). The parties agree that Plaintiff has established the first two elements of a *prima facie* case.

a.     Whether Plaintiff has Established that He was Meeting the Town's Legitimate Job Expectations at the Time of His Termination

The Magistrate Judge found that Plaintiff failed to establish a prima facie case of race discrimination because Plaintiff could not satisfy the third prong of the test, that he was meeting his employer's legitimate job expectations at the time of his termination. The Magistrate Judge concluded that the Town has presented substantial evidence that Plaintiff was not meeting its

legitimate job expectations at the time of his termination.  Plaintiff objects to this finding arguing that he was a successful Recreation Director, he received performance rating above "meets expectations" from 2003 to 2005, and that his 2006 performance evaluation, finding his performance to be unsatisfactory, is based upon unverified verbal complaints, which Plaintiff contends do not constitute appropriate grounds for summary judgment.  The court disagrees.

In making this showing, "[i]t is the perception of the decision maker which is relevant." *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996).  Therefore, a plaintiff's self-assessment and the assessment of his or her co-workers cannot establish a genuine issue of material fact as to whether a plaintiff was meeting his employer's expectations.  *King v. Rumsfeld*, 328 F.3d 145,149 (4th Cir. 2003); *see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000); *Evans Tech.*, 80 F.3d at 960-61 (4th Cir. 1996).

Thus, Plaintiff's own opinion that he was a successful Recreation Director has no bearing on whether he was meeting the legitimate job expectations of his employer.  In addition, while Plaintiff's performance evaluations from 2003 to 2005 demonstrate that Plaintiff had previously met his employer's job expectations, these evaluations do not, without more, create a genuine issue of fact as to whether Plaintiff was meeting his employer's legitimate job expectations *at the time of his termination*.  Plaintiff received an unsatisfactory performance evaluation in 2006 and was given until May 2007 to "right the ship."  In May 2007, the Town Council decided that Plaintiff was not performing satisfactorily and terminated him.

Plaintiff attempts to demonstrate a genuine issue of material fact with regard to meeting his employer's job expectations by challenging the validity of the alleged verbal complaints upon which much of his 2006 performance evaluation was based.  Plaintiff specifically avers that these

complaints are illegitimate because they are unwritten. Plaintiff, however, has offered no more than mere speculation as to the lack of legitimacy of these complaints, which is insufficient to survive summary judgment. Plaintiff admitted in his deposition that he had no evidence that these complaints were not made. (Pl. Dep. 69:16-70:8). In addition, the record supports the existence of these complaints. Holmes, who voted against Plaintiff's termination, confirms in his affidavit that numerous verbal complaints were made against Plaintiff. Moreover, as was noted by the Magistrate Judge, Plaintiff appears to acknowledge that verbal complaints were made, but takes the position that such complaints cannot be counted against him. (Pl. Dep. 63: 12-65:18; 69:21-85:24).

Moreover, the Town has presented significant evidence that Plaintiff was not meeting its legitimate job expectations. Plaintiff's unsatisfactory performance evaluation in 2006 was also based upon two written complaints from Town citizens, one of whom was black. Plaintiff has failed to create a genuine issue of fact with regard to whether he was meeting the legitimate job expectations of his employer at the time of his termination. Plaintiff therefore, has not met the met the third prong of a *prima facie* case for discrimination under the *McDonnell Douglas* framework.

> b.      Whether Plaintiff's Position was Filled by a Similarly Qualified Applicant Outside of the Protected Class

The Magistrate Judge concluded that Plaintiff met the fourth prong of a *prima facie* case for race discrimination. Defendants object to this conclusion arguing that although Hewitt is outside of the protected class, he is substantially more qualified to be the Town's Recreation Director than Plaintiff, and thus not a similarly qualified applicant. Defendants argue that Plaintiff lacks administrative experience as compared to Hewitt. An applicant may not be similarly qualified if he or she has superior experience in material and relevant respects. *See White v. Columbus Metropolitan Housing Authority*, 429 F.3d 232, 244 (6th Cir. 2005).

As was noted by the Magistrate Judge, Plaintiff and Hewitt had different kinds of experience. Plaintiff was from the Town and grew up playing sports in the Town's recreational program. In addition, Plaintiff coached football in the Recreation Department's program for fifteen years, and was a high school assistant football coach for nine years. Hewitt, on the other hand, was a high school teacher, coach and athletic director for 32 years. For 29 of those years, Hewitt was the high school athletic director. Thus, while Hewitt clearly had more administrative experience, Plaintiff had more personal experience with the Town's recreational program. The court concludes that Hewitt and Plaintiff are similarly qualified and the Plaintiff met the fourth prong of his *prima facie* case.

Because Plaintiff has failed to establish a prima facie case for race discrimination, the court grants summary judgment on this issue. Even if the court were to find that Plaintiff established a prima facie case of discrimination, he would not prevail.

2.      Whether Defendants have Produced a Legitimate Non-Discriminatory Reason for Plaintiff's Termination

Once a plaintiff establishes a prima facie case for race discrimination, the burden shifts to the defendants to produce a legitimate non-discriminatory reason for their actions. This burden is one of production, not persuasion. *Holland*, 487 F.3d at 214. As was discussed above, Defendants' proffered reason for its termination of Plaintiff is that his work was unsatisfactory.

3.      Whether Plaintiff has Established Pretext

Because Defendants produced a legitimate non-discriminatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to establish pretext. The Magistrate Judge concluded that Plaintiff could not establish that the reason proffered by Defendants was pretextual. Plaintiff objects to this finding, arguing that Defendants' proffered reason for Plaintiff's termination is

pretextual because the complaints against Plaintiff were mostly unwritten and anonymous, but were accepted as accurate despite Plaintiff's denials. The court disagrees.

A plaintiff can demonstrate pretext by proffering evidence that similarly situated employees were not fired. *Pence v. Tenneco Auto. Operating Co., Inc.*, 169 Fed. App'x 808, 811 (4th Cir. 2006). To be similarly situated, identified employees must have "dealt with the same supervisor, [been] subject to the same standards and engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Heyward v. Monroe*, 166 F.3d 332 (Table), 1998 WL 841494, at *2 (4th Cir. Dec. 7, 1998).

Plaintiff has identified several white employees/department heads who he alleges were similarly situated and not terminated. First, Plaintiff identified Jimmy Black ("Black"), a white police officer who was accused of drawing a weapon on his wife, but was not terminated. However, the charges against Black were dropped. (Neely Aff., Aug. 6, 2009, ¶ 2). In addition, the court notes, and Plaintiff does not dispute, that Black was later terminated when he was videotaped spotlighting deer illegally.

Second, Plaintiff contends that Police Chief Roger Kaney ("Kaney") was not terminated despite allegations of violations of the vehicle chase policy and racism. The court notes that the complaints against Kaney were actually complaints against subordinates for whom Kaney was responsible. This situation is distinguishable from the complaints against Plaintiff, which were specific to Plaintiff's own actions. In addition, no violations of the vehicle chase policy were actually found. Thus, Kaney is not a proper comparator for Plaintiff.

Third, Plaintiff identifies Micheal Schumpert ("Schumpert"), the officer who allegedly actually violated the vehicle chase policy and who was not terminated. However, investigation into

these allegations resulted in a finding that Schumpert had not violated vehicle chase policies. (Neely Aff., Aug. 6, 2009, ¶ 3).

Fourth, and finally, Plaintiff identifies Calvin Melton, the Town's sanitation and maintenance director, who was accused of sexually harassing young girls involved in a community service program headed by Melton. Plaintiff argues: "that a white director , who was investigated by SLED for sexually harassing minors, was not terminated and the black director who had complaints against him for mere disorganization was terminated is ample evidence of pretext. . . ." Entry 58 at 6. An investigation was performed by SLED, but no charges have been filed. Because there has been no finding adverse to Melton, Melton is not a proper comparator for Plaintiff. Plaintiff has failed to establish pretext.

      3.     *Whether Plaintiff Was Required to Show that He Would Not Have Been Terminated "But For" His Race*

The Magistrate Judge stated in the Report and Recommendation that Plaintiff must show that "but for" Plaintiff's race, he would not have been terminated. Plaintiff argues that he need only show that race was a motivating factor in his termination and not a "but for" cause.

Plaintiff can prove a race discrimination case by

> presenting sufficient evidence that an employer's proffered legitimate reasons for an adverse employment action were merely a "pretext" for race discrimination, under the method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973), or by presenting sufficient evidence that, despite the existence of legitimate, nondiscriminatory reasons for the adverse employment action, race was also a motivating factor in the decision (the "mixed-motive" method). *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-85 (4th Cir. 2004) (en banc).

*Murray v. United Food & Commercial*, 100 F. App'x 165, 171 (4th Cir. 2004). The court, having already determined that Plaintiff has not established a prima facie case under the *McDonnell Douglas*

framework, will address whether Plaintiff can survive summary judgment under the mixed motive framework.

Under the mixed-motive framework, Plaintiff can establish a claim of racial discrimination if he can demonstrate that, although Defendants' termination decision "may have been based upon legitimate, non-discriminatory reasons, it was also at least in part motivated by racial bias on the part of a relevant decisionmaker." *Murray*, 100 F. App'x at 175 (citing *Hill*, 354 F.3d at 284). In mixed-motive cases, "the employee need not demonstrate that the prohibited characteristic was the sole motivating factor to prevail, but must present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race . . . was a motivating factor for the employment practice." *Id.* (internal citations and quotation marks omitted). It is sufficient for Plaintiff to demonstrate that the termination decision was motivated by "both permissible and forbidden reasons. *Hill*, 354 F.3d at 284.

Whether one who harbors a discriminatory bias may be considered "a 'decisionmaker' for Title VII purposes is a separate inquiry." *Murray*, 100 F. App'x at 176. Under this framework, employers are held liable for the improper motivations of persons who make employment decisions, but not for the improper motivations of persons who just influence such a decision. *Hill*, 354 F.3d at 284.

Under this framework, Plaintiff had the burden of presenting sufficient evidence that T. Rivers and/or the Town Council members who were responsible for Plaintiff's termination harbored racial animus against him. *Murray*, 100 F. App'x at 176. Plaintiff did not proceed under the mixed-motive framework, and thus failed to point to any evidence to establish racial bias. Plaintiff alleges in his complaint that he was the Town's first black department head, and that his termination was

based on racial bias. "Mere speculation by the plaintiff that the defendant had a discriminatory motive is not enough to withstand a motion for summary judgment." *Autry v. N. Carolina Dep't of Human Res.*, 820 F.2d 1384, 1386 (4th Cir. 1987). Based upon all of the foregoing, Defendant's motion for summary judgment on Plaintiff's claim of race discrimination is granted.

C.     Claim for Civil Conspiracy

The Magistrate Judge found that there is no genuine issue of material fact as to Plaintiff's civil conspiracy claim and granted Defendants summary judgment on this claim. Plaintiff did not object to the Magistrate Judge's grant of summary judgment on this issue. In the absence of objections to the Report and Recommendation, this court is not required to give any explanation for adopting the recommendation. *Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983). Nevertheless, the court has carefully reviewed the record in this case and concurs in the Magistrate Judge's recommendation.

Defendants object to the Magistrate Judge's conclusion that Plaintiff's position as part-time Recreation Director did not make him a public official of the Town. However, because Plaintiff did not object to the Magistrate Judge's grant of summary judgment on this claim, the court need not reach this issue.

III.  CONCLUSION

Defendants' motion for judgment on the pleadings is **denied**. Defendants' motion for summary judgment is **granted**.

**IT IS SO ORDERED.**

s/ Margaret B. Seymour
The Honorable Margaret B. Seymour
United States District Judge

March 31, 2010

Columbia, South Carolina